UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-81191-CIV-MATTHEWMAN

PAM QUAGLIOZZI,

      Plaintiff,

v.

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security Administration,

      Defendant.

_____/

FILED BY____KJZ____D.C.

**Sep 20, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 24, 32]</u>

**THIS CAUSE** is before the Court upon Plaintiff, Pam Quagliozzi's ("Plaintiff") Amended Motion for Summary Judgment [DE 24], and Defendant, Kilolo Kijakazi, Acting Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment [DE 32]. The parties have consented to Magistrate Judge jurisdiction. [DE 11]. Plaintiff has filed a Reply [DE 38], and the matter is now ripe for review. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Andrew Saul as the Defendant. No further action need be taken to continue this suit consistent with the Social Security Act.  *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

# I. <u>FACTS</u>

On May 1, 2017, Plaintiff filed an application for disability insurance benefits, alleging disability beginning on January 31, 2017. [R. 121–144, 338–44].[2] The claim was denied initially and upon reconsideration. [R. 121–144]. Following two hearings held on February 7, 2019 and October 15, 2019, an Administrative Law Judge ("ALJ"), Jose Perez-Gonzalez, issued a decision on November 7, 2019, denying Plaintiff's claim for benefits. [R. 15–40]. A request for review was filed with the Appeals Council and denied on June 18, 2020. [R. 1–5].

## A.   <u>Hearing Testimony</u>

The ALJ held two hearings, one on February 7, 2019 and another on October 15, 2019. [R. 1453–77, 1478–88]. Plaintiff appeared with her counsel for both hearings.

At the first hearing, Dr. Lewis Arnold Fuchs, a board-certified orthopedic surgeon, testified first as a stipulated medical expert. [R. 1460–65]. Based on his review of the medical evidence of record, Dr. Fuchs described Plaintiff's severe physical impairments as being "status post-November 2017 posterior lumbar interbody fusion, L4/5, with residual radiculitis" and testified that Plaintiff did not meet or equal a listing during the relevant period. [R. 1461]. Dr. Fuchs further testified that he believed Plaintiff "can clearly perform sedentary, and perhaps even light work, based just on the review of the records, and the objective neurological examinations." [R. 1461]. Dr. Fuchs summarized the medical records he reviewed to reach this conclusion and confirmed his belief that, based on this review, Plaintiff did not have a severe impairment regarding her back for at least 12 consecutive months. [R. 1461–65].

---

[2] All references are to the original and supplemental certified record of the administrative proceeding filed by the Commissioner in Docket Entries 10 and 36.

Plaintiff testified next as follows. She was born in 1958 and was 60 years old at the time of the hearing. [R. 1465]. She has a driver's license but only drives short distances up to 30–40 minutes at a time due to back pain requiring her to recline. [R. 1465–66]. She is a high school graduate who has prior work experience as a bookkeeper and photographer—that is, until she had to stop working due to severe pain. [R. 1466–70]. Plaintiff testified that she is unable to work due to back pain that starts in her lower back and sometimes radiates down her leg causing numbness and shooting pain. [R. 1470–71]. She lays down every hour or two to rest for 30 minutes to an hour. [R. 1471]. Sitting is the most difficult for her and she must get up to move around every 30–40 minutes. [R. 1472]. She takes pain medications and has had injections in her back both before and after her surgery. [R. 1472]. She also takes medications prescribed by her primary care physician to treat depression. [R. 1475].

After hearing from Plaintiff, the ALJ announced that he would send Plaintiff for two consultative examinations—one with an orthopedic surgeon who could examine Plaintiff with full access to Plaintiff's entire record, and a second psychological consultative examination "with a mental status exam with RFC." [R. 1472–73, 1475–76]. Upon request by the ALJ, the vocational expert, Gary Fannon, described Plaintiff's past relevant work as a photographer and bookkeeper as being light work and sedentary work, respectively. [R. 1475–76]. The ALJ then concluded the hearing. [R. 1476].

The same ALJ presided over a second supplemental hearing on October 15, 2019. Tanja Hubacker, a vocational expert, testified at this second hearing. [R. 1481–87]. After Ms. Hubacker confirmed Plaintiff's past work as a photographer and bookkeeper, the ALJ posed a hypothetical with varying workday limitations, including but not limited to sitting for only 45 minutes at a time.

[R. 1482–84]. Noticeably absent from the ALJ's hypothetical were any limitations in mental functioning, as the ALJ specifically stated that he found "no medical basis that [Plaintiff] would have difficulty in social function." [R. 1483–84]. The vocational expert explained that the hypothetical individual with the limitations described by the ALJ could return to work as a bookkeeper based on the expert's experience, the Dictionary of Occupational Titles, and the selected occupation characteristics. [R. 1484].

Plaintiff's counsel then posed a series of hypotheticals to the vocational expert in which an individual was limited as described by the ALJ but would also need to lie down every hour for about 30 minutes, could only work for four hours a day, or would be absent approximately two days a month due to severe pain. [R. 1485–87]. As for each of these additional hypothetical limitations, the vocational expert opined that such an individual could not return to work as a bookkeeper and that there would be no available work for him or her. [R. 1485–87].

### B.   Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

#### 1.   General Medical History and Evidence Prior to January 31, 2017

Plaintiff's medical history is extensive, as Plaintiff has had numerous health issues over the years. Specifically, Plaintiff has a past medical history including gastroesophageal reflux disease (GERD), breast cancer, melanoma, and hyperparathyroidism. [R. 625]. Moreover, Plaintiff has had open heart surgery, surgery on her right knee and left toe, a left breast lumpectomy, and previously had one of her parathyroid glands removed. [R. 625, 482, 499, 674].

However, on February 22, 2016, Plaintiff presented to Matthew Steibel, M.D., complaining of a separate issue—acute lower back pain. [R. 534]. Dr. Steibel examined Plaintiff's lower back, finding loss of full spine flexion and extension, limited right and left lateral bending, and tenderness in Plaintiff's lumbar spine. [R. 534]. Dr. Steibel obtained x-rays of Plaintiff's lumbar spine, which revealed "moderate multilevel intervertebral disc space narrowing" and posterior osteophytes at L1, L2, L3, L4, and L5. [R. 534]. Accordingly, Dr. Steibel diagnosed Plaintiff with intervertebral disc degeneration of the lumbar spine, and he ordered an MRI for further examination. [R. 534–35].

Roughly one week later, David Feldman, M.D., conducted an MRI of Plaintiff's lumbar spine. [R. 517]. Dr. Feldman provided the following impressions of Plaintiff's MRI:

1.   Mild-to-moderate diffuse lumbar spondylosis without listhesis or compressive deformity.
2.   At L4-5, both the L5 roots are displaced and the canal is mildly stenotic. There is foraminal narrowing by intraforaminal disc minimally effacing the exiting right L4 root.
3.   At L5[]-S1, leftward disc protrusion displaces the left S1 root. There is no canal stenosis, but intraforaminal disc leftward effaces the left L5 root.
4.   At L3-4, disc protrusion rightward slightly displaces the right L4 root. The canal is mildly stenotic. There is no significant foraminal narrowing or exiting root effacement.
5.   At L2-3, disc protrusion without root displacement or significant foraminal narrowing. The canal is mildly stenotic at this level.
6.   Multiple levels of canal stenosis suggests there is some underlying congenital stenosis due to short pedicles.

[R. 517–18]. Based on Plaintiff's MRI results, on March 7, 2016, Dr. Steibel prescribed Celebrex and recommended physical therapy for Plaintiff. [R. 531–32].

2.  Medical History Post-Onset Date and Pre-Lumbar Fusion

The medical record evidence is devoid of documentation pertaining to Plaintiff's back for the remainder of 2016.[3] However, on January 31, 2017 (the onset date for Plaintiff's disability claim), Plaintiff arrived at an urgent care center, complaining of non-radiating back pain in her mid and lower lumbar spine. [R. 482]. While Plaintiff reported that she had been in treatment for back problems for approximately eight months, Plaintiff stated that her "constant, severe, sharp, [and] stabbing" pain—which necessitated her trip to the urgent care center—began roughly five or six hours earlier. [R. 482]. Plaintiff further stated that her back pain worsened with walking and sitting but was partially alleviated while standing. [R. 482]. Michele DiCarlo, P.A., conducted a physical examination of Plaintiff, finding a decreased range of motion in Plaintiff's back flexion and extension. [R. 483].

On February 2, 2017, Plaintiff presented to Heldo Gomez, M.D., a neurosurgeon, for treatment of her back pain. [R. 491]. Plaintiff reported "pain in the lumbar region, left greater than right, which radiates into the hip and buttock region." [R. 491]. Dr. Gomez conducted a physical examination of Plaintiff, noting that Plaintiff appeared in acute distress and had an anthropoid posture. [R. 491]. He found tenderness and trigger points in Plaintiff's lumbar region, "left greater than right." [R. 491]. Dr. Gomez diagnosed Plaintiff with lower back pain and sciatica, injecting Plaintiff's lumbar region with Depo-Medrol. [R. 491]. Moreover, due to a lack of recent imaging studies, Dr. Gomez recommended that Plaintiff undergo another MRI of her lumbar spine. [R. 491].

---

[3] On April 21, May 13, and May 20, 2016, Plaintiff presented to Bonnie Murphy, D.O., to discuss results from a gastrointestinal exam, to treat jaw pain, and to follow-up with respect to her jaw pain, respectively. [R. 628–34]. During those visits, Plaintiff did not report back pain.

Plaintiff underwent a second MRI of her lumbar spine at the behest of Dr. Gomez, on February 13, 2017. [R. 486]. Henry R. Zayas, M.D., performed the MRI, describing the following impressions:

1. Mild to moderate multilevel mid to lower lumbar degenerative disc changes.
2. L2-3 marginal osteophyte/disc bulge and small superimposed right central disc herniation/protrusion.
3. L3-4 marginal osteophyte/disc bulge and borderline right-sided neural foraminal stenosis, but no central canal stenosis.
4. L4-5 asymmetric degenerative disc changes with marginal osteophyte/disc bulge eccentric to the right. L4-5 mild right greater than left neural foraminal stenosis. L4-5 mild facet arthrosis.
5. L5-S1 minimal marginal osteophyte/disc bulge eccentric to the left with borderline to mild left-sided neural foraminal stenosis.

[R. 486].   And, two days later, Plaintiff returned to Dr. Gomez for a follow-up visit concerning her MRI results. [R. 489]. Dr. Gomez determined that Plaintiff's MRI showed "evidence of multilevel degenerative disk disease at L2-3, L3-4, L4-5 and L5-S1." [R. 489]. He further stated that there was "evidence of complete loss of disk space height with advanced intervertebral osteochondrosis and spondylosis deformans most severe at L4-5 followed by L3-4, L2-3, and L5-S1." [R. 489].

In conjunction with his physical examination of Plaintiff, Dr. Gomez opined that Plaintiff's work capacity fell within the light work specification. [R. 489]. He stated that Plaintiff: (1) "should avoid activities such a stooping, crawling and bending"; (2) "must take breaks lasting fifteen minutes at a time as needed for pain relief"; (3) "must be able to lie down/supine on an as needed basis for pain relief"; and (4) "is expected to be unable to engage in activities [o]n an uninterrupted basis." [R. 489]. Dr. Gomez additionally opined that, "[w]ithin reasonable medical certainty,

[Plaintiff] is expected to miss at least two to three days a month from work based on her symptoms, signs, imaging studies, mechanisms of pain and chronic condition." [R. 490].

Subsequently, Plaintiff presented to Bonnie Murphy, D.O—her primary care practitioner—on February 16, 2017, complaining of back pain. [R. 494]. Although Plaintiff reported being "a lot better" after her trip to the urgent care center and treatment course with Dr. Gomez, Plaintiff wore a back brace and stated she "doesn't sit for long periods of time any longer." [R. 494]. Dr. Murphy provided an assessment of degenerative disc disease and referred Plaintiff for a follow-up examination with a rheumatologist who Plaintiff had seen in the past. [R. 494].

Pursuant to Dr. Murphy's referral, Plaintiff visited Reshma M. Khan, M.D., on February 28, 2017. [R. 1030]. There, Dr. Khan noted Plaintiff's MRI results, which "showed mild to moderate degenerative disc disease." [R. 1030]. Dr. Khan conducted a physical examination of Plaintiff, finding a severe paralumbar spasm over Plaintiff's mid back, paraspinal tenderness, and decreased lumbar flexion. [R. 1031]. Dr. Khan assessed muscle spasm of the back and back pain, noting that, despite Plaintiff's "mild to moderate DJD in her MRI . . . most of her symptoms are related to muscle spasm." [R. 1032]. Consequently, Dr. Khan prescribed muscle relaxers, Amrix, and Naproxen, and recommended that Plaintiff follow up with her primary care practitioner or physiatrist. [R. 1032].

Plaintiff returned to Dr. Steibel for a follow-up visit concerning her lower back pain, on March 6, 2017. [R. 514–15]. Upon examination, Dr. Steibel found that Plaintiff had "limited left lateral bending, limited right lateral bending, loss of full spine flexion, . . . loss of full spine

extension" and tenderness of the lumbar spine. [R. 514]. This time, rather than physical therapy alone, Dr. Steibel's treatment plan included an epidural steroid injection. [R. 515].[4]

Plaintiff presented to Sheldon Regenbaum, M.D, on March 24, 2017, for consultation on an epidural steroid injection. [R. 499]. During Plaintiff's visit, Plaintiff complained of back pain, muscle pain, and muscle spasms, stating that changing positions made her pain better and that sitting made her pain worse. [R. 500]. Further, Plaintiff described her pain (which she noted was located in her lower left back) as being a 5–6 out of 10. [R. 501]. A general examination of Plaintiff revealed tenderness of the left mid back, an antalgic gait with a restricted range of motion, and a positive straight left leg raise test. [R. 652]. Dr. Regenbaum assessed lumbar degenerative disc disease and left lumbar radiculopathy, recommending a lumbar epidural steroid injection. [R. 652].

Based on Dr. Regenbaum's recommendation, on April 26, 2017, Plaintiff received her first lumbar epidural steroid injection. [R. 652, 502, 661]. However, Plaintiff continued to report significant lumbar pain, even after said injection and physical therapy. [R. 428, 1114–28]. Indeed, Plaintiff reported a 50% reduction in pain but was "still not functioning well." [R. 649]. Plaintiff therefore received a second epidural steroid injection on May 31, 2017. [R. 581-85, 659].

Subsequently, Plaintiff presented to Dr. Murphy to discuss her back pain issues on June 1, 2017. [R. 603]. Although Plaintiff denied having anxiety or being in a depressed mood, Dr. Murphy noted that Plaintiff was crying throughout her general examination and could not sit down. [R. 605]. In fact, that same date, Dr. Murphy filled out an "Attending Physician's Statement," in which she reported that Plaintiff could not "sit, stand, walk or lay flat for any period of time." [R.

---

[4] Plaintiff had a follow-up appointment with Dr. Murphy concerning her back pain and recent MRI results on March 7, 2017. [R. 509]. However, Dr. Murphy noted that Dr. Steibel (who she referred to as Dr. Steeple) already explained the MRI results to Plaintiff. Dr. Murphy merely repeated Dr. Steibel's assertion that Plaintiff would likely benefit from epidural injections.

636]. In connection therewith, Dr. Murphy opined that Plaintiff would "probably never" be able to return to work. [R. 637].

In a Disability Determination Explanation at the Initial Level, Marsha A. Hill, SDM, found on June 6, 2017, that Plaintiff suffered from the medically determinable impairment of "spine disorders," which she noted was severe. [R. 125]. Ms. Hill stated that Plaintiff's medically determinable impairment could reasonably be expected to cause her claimed pain symptoms. [R. 125]. However, Ms. Hill stated that Plaintiff's complaints of pain were only partially consistent with the medical record evidence. [R. 125]. Additionally, Ms. Hill stated that the opinion of Dr. Gomez—providing that Plaintiff should take breaks every fifteen minutes—was unsupported. [R. 126].

Further, in the same Disability Determination Explanation at the Initial Level, Ms. Hill conducted a Physical Residual Functional Capacity Assessment of Plaintiff. [R. 126–238]. Ms. Hill found that Plaintiff had exertional limitations. [R. 126]. In this regard, she stated that Plaintiff could: (1) occasionally lift and/or carry up to 20 pounds; (2) frequently lift and/or carry up to 10 pounds; (3) stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; (4) sit (with normal breaks) for a total of about six hours in an eight-hour workday; and (5) push and/or pull an unlimited amount, "other than shown, for lift and/or carry." [R. 126]. Ms. Hill also found that Plaintiff had certain postural limitations, including occasional limitations in climbing ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling. [R. 127]. Based on her assessment, Ms. Hill determined that Plaintiff was not disabled. [R. 129].

On June 12, 2017, at a follow-up appointment related to her previous breast cancer diagnosis, Plaintiff reported concerns about her lumbar disc spinal disorder, as well as concerns

10

about "new left hand tingling." [R. 1146]. Elisabeth McKeen, M.D., recommended that Plaintiff obtain an x-ray of her cervical spine. [R. 1148]. Consequently, the next day, Plaintiff had an x-ray taken of her cervical spine. [R. 984]. The interpreting radiologist, Walter Forman, M.D., found that Plaintiff had "mild scoliotic curvature of the spine concave toward the right side" and "degenerative disc change at L4-L5 and L5-S1," which he concluded constituted cervical spondylosis. [R. 984].

Shortly thereafter, on June 15 and July 13, 2017, Plaintiff presented to Dr. Regenbaum for follow-up appointments concerning her back. [R. 642–47, 663–65, 671]. At those appointments, Plaintiff reported doing better following her second epidural steroid injection, but still noted difficulty sitting for more than 30-45 minutes. [R. 642, 646]. Plaintiff additionally complained of intermittent pain on her left side, mostly in her lower back, which she described as being a 3–5 out of 10 in June, and a 6 out of 10 in July. [R. 663–65]. Plaintiff stated she was more comfortable lying flat, and that standing, bending, and sitting made her pain worse. [R. 664]. During Plaintiff's June appointment, a general examination revealed pain with lumbar extension, tenderness in Plaintiff's left mid back, an antalgic gait with restricted range of motion, and a positive straight left leg raise test. [R. 646]. Similarly, during Plaintiff's July appointment, a general examination revealed pain with lumbar extension, a diminished range of motion in the lumbar spine, and an antalgic gait with restricted range of motion. [R. 643].[5]

In a Disability Determination Explanation at the Reconsideration Level, Ronald Machado, M.D., found on July 25, 2017, that Plaintiff suffered from the medically determinable impairment

---

[5] At Plaintiff's request, Dr. Regenbaum completed an "Attending Physician's Statement" on July 13, 2017, stating that it was "to be determined" when Plaintiff could return to work. [R. 642]. However, he also stated that Plaintiff was unable to sit for more than 30 minutes. [R. 642, 671].

of severe "spine disorders." [R. 137]. And, he found that Plaintiff's medically determinable impairment could reasonably be expected to cause her claimed pain symptoms. [R. 125]. However, Dr. Machado stated that Plaintiff's complaints of pain were only partially consistent with the medical evidence of record, and that the opinion of Dr. Gomez—providing that Plaintiff should take breaks every fifteen minutes—was not supported by the medical record evidence. [R. 125, 138].

Dr. Machado also conducted a Physical Residual Functional Capacity Assessment of Plaintiff as part of his Disability Determination Explanation at the Reconsideration Level. [R. 139]. To this end, Dr. Machado first determined that Plaintiff had exertional limitations. [R. 139]. He stated that Plaintiff could: (1) occasionally lift and/or carry up to 20 pounds; (2) frequently lift and/or carry up to 10 pounds; (3) stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; (4) sit (with normal breaks) for a total of about six hours in an eight-hour workday; and (5) push and/or pull an unlimited amount, "other than shown, for lift and/or carry." [R. 139]. Next, he found that Plaintiff had certain postural limitations; specifically, occasional limitations in climbing ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling. [R. 139]. And lastly, Dr. Machado determined that Plaintiff had environmental limitations, stating that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards (such as machinery and heights). [R. 140]. Dr. Machado thus concluded Plaintiff was not disabled. [R. 143].

After Plaintiff had a third lumbar epidural steroid injection,[6] on August 2, 2017, Plaintiff presented to Alexander N. Lenard, M.D., an orthopedic care specialist, for a surgical consultation.

---

[6] [R. 657, 760, 835].

[R. 843, 799]. Plaintiff described "[i]ntermittent radiating pain down [her] left leg with numbness/tingling [of the] left plantar foot." [R. 843]. An examination of Plaintiff revealed abnormalities in the lumbar spine (specifically, pain elicited by motion), as well as tenderness on palpation of the left buttock and abnormalities in Plaintiff's left plantar foot. [R. 844]. Dr. Lenard discussed surgical options and referred Plaintiff for a CT scan. [R. 845, 672].

Robert Stickle, M.D., conducted a CT scan of Plaintiff's lumbar spine on August 10, 2017. [R. 672]. Dr. Stickle provided the following impression: (1) "L4-L5 osteophyte ridge which results in moderate canal stenosis"; (2) "moderate right and mild to moderate left neural foraminal narrowing[, where the] disc and osteophyte abut the exiting right L4 nerve root"; (3) "mild lumbar levoscoliosis"; and (4) "indeterminate 8 mm low attenuation lesion lateral segment left hepatic lobe." [R. 672–73]. Dr. Lenard agreed with Dr. Stickle's interpretation, diagnosing Plaintiff with lower back pain and radiculopathy of the lumbar region. [R. 677]. He offered Plaintiff an L4-5 decompression and fusion surgery, which he noted Plaintiff would consider and schedule. [R. 676].

On August 25, 2017, Plaintiff obtained another surgical consultation from Elias Dakwar, M.D, a neurosurgeon. [R. 679–82, 687]. Plaintiff reported a constant, aching, and burning pain in her lower back, left buttock, and left leg, which she stated was an 8 out of 10 at its worst. [R. 679]. She stated that the pain increased when sitting but was "relieved" with lying down. [R. 679]. Upon review of the MRI and CT of Plaintiff's lumbar spine, Dr. Dakwar diagnosed Plaintiff with lumbar spondylosis, and "spinal stenosis, lumbar region, without neurogenic claudication." [DE 682]. Dr. Dakwar recommended an L4-5 "minimally invasive lumbar interbody fusion." [R. 681].[7]

---

[7] Dr. Dakwar later signed a letter, on September 13, 2017, stating that Plaintiff's complaints of pain "when sitting or standing in one position after 30-45 minutes is consistent with her chronic condition." [R. 978]. He stated Plaintiff "must be able to take breaks." [R. 978].

Plaintiff returned to Dr. Regenbaum for an appointment concerning her lower back pain on August 31, 2017. [R. 795]. At that appointment, Plaintiff continued to complain of lower back pain, left buttock pain, and paresthesia in her left toes, stating that her pain was a 6–7 out of 10. [R. 795]. Plaintiff further stated that sitting aggravated her pain, but that resting or lying flat improved it. [R. 795]. A general examination of Plaintiff revealed pain with lumbar extension, a diminished range of motion in her lumbar spine, and an antalgic gait with a restricted range of motion. [R. 796].[8] Dr. Regenbaum discussed facet injections and a facet rhizotomy with Plaintiff, with Plaintiff agreeing to proceed with a lumbar facet injection. [R. 797].

Accordingly, on September 18, 2017,[9] Plaintiff received an intraarticular facet injection at L3-4, L4-5, and L5-S1 on her left side. [R. 833]. However, at a September 28, 2017 follow-up appointment with Dr. Regenbaum, Plaintiff reported feeling only "20% better." [R. 690]. Dr. Regenbaum thus took note of the failed epidural steroid and lumbar facet injections, and of Plaintiff's desire to proceed with surgery. [R. 692]. Indeed, on October 2, 2017, Plaintiff presented to Dr. Murphy for an appointment concerning her back, where Plaintiff also reported having "very little relief" from the lumbar facet injection. [R. 1062]. At that appointment, Dr. Murphy opined that Plaintiff could not sit, stand, or walk for any length of time, noting that Plaintiff was "laying [sic] down during her entire exam." [R. 1062].

---

[8] Plaintiff also visited Dr. Regenbaum on August 14, 2017. [R. 799–801]. Plaintiff's complaints were generally the same, although she reported that her pain was a 7 out of 10 at the August 14, 2017 examination.

[9] Notably, a few days prior, Plaintiff presented to Sharon Miller, M.D., for a follow-up appointment concerning her hyperparathyroidism, where Plaintiff noted that she had been experiencing severe back pain since January. [R. 866]. Dr. Miller ordered certain lab testing and a bone density and vertebral fracture risk assessment. [R. 867–68]. And, on September 15, 2017, Plaintiff had a bone density with vertebral fracture assessment done, which revealed osteopenia (low bone density), and a normal vertebral fracture assessment result. [R. 972–93]. On October 18, 2017, Dr. Khan diagnosed Plaintiff with osteoporosis. [R. 1024].

### 3. Plaintiff's Lumbar Fusion Surgery

Plaintiff underwent another MRI of her lumbar spine on November 7, 2017. [R. 694]. T M

Cortinas, M.D., the interpreting radiologist, reported the following impressions:

1. Levoconvex scoliosis. Straightening of the lumbar lordosis.
2. Degenerative changes of the facet joints L1-2 through L5-S1 and of the disc interspaces L2-3 through L4-5.
3. Broad concentric disc bulge with superimposed focal right paracentral disc protrusion/herniation at L2-3, narrowing the right lateral recess and encroaching on the right L3 nerve root. This may partially account for the patient's symptoms. Recommend correlation with clinical myotome.
4. Far left lateral disc protrusion/herniation at L2-3 without nerve root impingement.
5. Narrowing of the lateral recesses without nerve root impingement at L3-4.
6. Schmorl's nodes at L3-4 and L4-5.
7. Facet arthropathy and broad disc bulge at L4-5 narrowing the neural foramina and encroaching on bilateral L4 and L5 nerve roots. This level may also partially account for patient's symptoms.
8. Mild right and moderate left neural foraminal narrowing at L5-S1, encroaching on the left L5 nerve root.

[R. 694–95]. And, with the recent MRI results on file, on November 8, 2017, Plaintiff underwent

pre-operative testing with Michael Yung-Shun Wang, M.D. [R. 696–710, 968–69].

During Plaintiff's pre-operative testing, Plaintiff complained of severe "back pain in the

flank on the left and left leg pain" (at a 6–7 out of 10) that was constant, aching, and burning. [R.

102, 700].[10] Plaintiff reported only being able to walk for 10 minutes, stating that her pain was

worse with standing and "relieved a little bit with rest." [R. 102, 700]. Upon reviewing Plaintiff's

imaging studies, Dr. Wang found that Plaintiff had "lumbar spondylosis at multiple levels," with

a "really notable" lateral olisthesis to the left at L4-L5, which was worse with standing and

"relieved somewhat with recumbency." [R. 104]. He further found that there was "significant

---

[10] Plaintiff stated the pain was "in the left flank radiating into the buttock down the side of the leg to the shin and foot." [R. 102].

foraminal height collapse and angulation of the dis[c]," with "some compensation 2 levels above at L2-3, so there is a focal scoliosis and slight olisthesis to the right, but it is not as severe and does not entrap[] as much of the neural elements." [R. 104].[11] Dr. Wang stated that, in his opinion, surgery would potentially be helpful for Plaintiff; specifically, "an L4-5 open posterior lumbar interbody fusion . . . [to] correct the listhesis in both planes, [and to] correct the neural foraminal collapse and treat th[e] focal scoliosis." [R. 113]. Thus, on November 29, 2017, following the failure of physical therapy, medication, three epidural steroid injections, and an intraarticular facet injection to alleviate Plaintiff's pain symptoms, Plaintiff underwent an "L4-5 posterior lumbar interbody fusion with intervertebral cage fixation device" procedure. [R. 963].

    4. Post-Lumbar Fusion

On January 15, 2018—at an appointment with Dr. Khan concerning Plaintiff's osteoporosis—a physical examination of Plaintiff revealed a normal gait and stance. [R. 1012]. However, Plaintiff still complained of lower back pain (though she did not specify to what extent). [R. 1012]. And, Dr. Khan found abnormal thoracolumbar spine kyphosis, thoracolumbar spine pain elicited by flexion and extension, no full range of motion of the thoracolumbar spine, and tenderness on palpation of the sacroiliac joint. [R. 1012–13].

Similarly, on January 22, 2018, at a follow-up appointment concerning Plaintiff's previous breast cancer diagnosis, Plaintiff complained of "Grade 2" bone pain. [R. 1138]. In other words, Plaintiff complained of "[m]oderate pain, pain or analgesics interfering with function, but not interfering with ADL" in connection with her lumbar spine. [R. 1138].[12] Thereafter (and perhaps

---

[11] Dr. Wang stated that Plaintiff's symptoms were "a little hard to sort out, which explains why she has gotten different opinions on what to do." [R. 104].

[12] Dr. McKeen found that Plaintiff was "[r]estricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature." [R. 1138].

somewhat contradictorily), at a January 29, 2018 follow-up appointment with Dr. Wang, Plaintiff reported doing well, stating that she did "not have significant lower back or leg pain save for occasional muscle spasms." [R. 1180].

Regardless, by the time of her February 13, 2018 appointment with Dr. Murphy, Plaintiff was again reporting issues with her back, stating that she remained unable to sit for more than 15 minutes at a time. [R. 948–50]. And, over the next several weeks, Plaintiff frequently complained of pain at a level of 5–7 out of 10 during her physical therapy appointments, "esp[ecially] with maintaining and changing a position or activity for a prolonged period of time." [R. 1070–1108]. Plaintiff also continued to complain of radiating symptoms into her foot. [R. 1078, 1074]. As a result, on May 30, 2018, Plaintiff had an additional x-ray taken of her lumbar spine. [R. 947]. Dr. Cortinas, the examining radiologist, identified: (1) postoperative fusion L4-5 with no change in alignment since the prior study and with continued bony union at the level; (2) L2-3 and L3-4 degenerative disc disease; and (3) levoconvex scoliosis. [R. 947].

Subsequently, on June 4, 2018, Plaintiff presented to Dr. Wang for a follow-up visit. [R. 1172–74]. Plaintiff was "much better than preop, but . . . still very inhibited and disabled by her symptomatology." [R. 1173]. While Plaintiff's "left lower extremity strength ha[d] improved significantly since her fusion surgery," Plaintiff stated she had "severe burning and aching in the lower back and down to the left lower extremity with numbness on the dorsum of the left foot" and "trouble sitting for prolonged periods." [R. 1173]. Indeed, Plaintiff reported being in "a lot of pain" (a 5 out of 10) after her drive from the Palm Beach area to Miami. [R. 1171–73]. Dr. Wang noted that Plaintiff's gait was steady but concluded that Plaintiff was "significantly still disabled

by her nerve injury." [R. 1171–73]. He prescribed a ROHO pillow and Gabapentin to "alleviate Plaintiff's neuropathic symptomatology." [R. 1172].

On June 7, 2018, Plaintiff underwent a medical evaluation from Craig H. Lichtblau, M.D., to assess her functional capacity. [R. 869]. Plaintiff reported continuing to experience "intermittent radiating pain into her left buttock down her lateral and posterior thigh with numbness and tingling in the plantar aspect of her left foot." [R. 873]. She described this pain as a 5–6 out of 10, with good days and bad days. [R. 872]. Plaintiff also noted she was most comfortable lying flat and reported feeling depressed and frustrated about her situation. [R. 873]. A physical examination of Plaintiff revealed "tenderness to light palpation along her lumbar paraspinal muscles with palpable muscle spasm present," as well as a "positive straight leg raise [test] in both lower extremities while in a seated position." [R. 875]. Thus, after reviewing Plaintiff's diagnostic history— including a history of "failed back surgery syndrome"—Dr. Lichtblau opined that Plaintiff's "complaints of pain [were a] direct result of chronic degenerative disc disease, spondylosis, multilevel disc herniations with impingement on her exiting nerve roots at her L4-L5 and L5-S1 spinal levels, and status post L4-L5 posterior lumbar fusion." [R. 878].

In Dr. Lichtblau's Medical Functional Capacity Assessment, Dr. Lichtblau determined that Plaintiff was able to follow instructions, had no difficulty communicating effectively, and was able to maintain concentration adequately. [R. 917]. However, Dr. Lichtblau noted that Plaintiff demonstrated slow pacing between activities and "required frequent rest periods and frequent changes in position." [R. 917–18]. In this regard, Dr. Lichtblau opined that Plaintiff did not have the functional capacity to work four hours per day on an interrupted basis, stating that Plaintiff should be in a setting that allows her to take breaks and change positions. [R. 918]. He further

opined that, while Plaintiff may perform bending, twisting, climbing protected heights, repetitive movement of elbows, and pushing and pulling, Plaintiff should "avoid repetitive bending, kneeling, squatting, crawling, climbing unprotected heights[,] . . . repetitive reaching overhead, running and jumping." [R. 918].

Ultimately, Dr. Lichtblau determined that "[t]he Medical Functional Capacity Assessment conducted on [Plaintiff's] behalf indicates an estimated residual functioning strength level from floor-to-shoulders position to be Sedentary as defined by the U.S. Department of Labor." [R. 918] (emphasis omitted). He further stated that Plaintiff would suffer from "acute, intermittent exacerbations of chronic pain and discomfort," which would cause Plaintiff to miss days of work. [R. 918]. Dr. Lichtblau therefore concluded that Plaintiff would be unable to maintain gainful employment in the open labor market or in a sheltered environment. [R. 919].

Over the next several months, Plaintiff had multiple appointments with Dr. Murphy. At the first appointment, on August 13, 2018, Plaintiff presented to Dr. Murphy because she was "not feeling well." [R. 1047]. Plaintiff reported feeling very depressed and having suicidal thoughts since she started taking her Gabapentin medication. [R. 1047–49].[13] In fact, Plaintiff was crying hysterically during her appointment. [R. 1038]. Dr. Murphy concluded Plaintiff was "having an ill effect from the [G]abapentin that [was] affecting her mood and causing depression." [R. 1047]. She advised Plaintiff to begin taking Lyrica instead. [R. 1047–49].

Accordingly, on September 11, 2018, at Plaintiff's second appointment with Dr. Murphy, Plaintiff denied having a depressed mood following her change in medication, stating that she

---

[13] While Plaintiff did not specifically complain of back pain at that visit, at visits in June and July of 2018 with Drs. Khan and McKeen, Plaintiff continued to complain of lower back pain. [R. 1005–07, 1134–36].

instead felt "drugged." [R. 1038]. However, Plaintiff was still having pain in her left buttock area down into her left leg. [R. 1038]. [14] Thereafter, on October 15, 2018, at Plaintiff's third appointment, rather than noting any depression or issues with her medications, Plaintiff informed Dr. Murphy that she had begun to experience excruciating pain several days earlier after she picked up her newborn grandchild from the baby carriage. [R. 1035].

On November 8, 2018, in addition to his earlier functional capacity assessment of Plaintiff, Dr. Lichtblau completed a "Medical Statement Concerning Physical Abilities & Limitations for Social Security Disability Claim." [R. 1163–65]. In Dr. Lichtblau's medical statement, he concluded that Plaintiff was unable to complete a typical 8-hour workday without interruptions from physically based symptoms, was unable to perform work-like activities while maintaining regular attendance, and was unable to perform at a consistent pace without more than the minimum number and length of required breaks. [R. 1163]. Dr. Lichtblau then identified Plaintiff's limitations, stating that Plaintiff: (1) could not sit or stand for more than 30 minutes at a time; (2) could not sit or stand for more than 60 minutes in an 8-hour workday; (3) could not lift more than 10 pounds on an occasional or frequent basis; (4) could occasionally bend, but could never stoop; (5) could frequently conduct fine and gross manipulation of her left and right hands; and (6) could occasionally raise her left and right arms over her shoulders. [R. 1163–64]. Dr. Lichtblau opined that Plaintiff suffered from severe pain, frequently required unscheduled breaks more than just once every 2 hours in an 8-hour workday, was required to periodically alternate between sitting

---

[14] Notably, during appointments in September 2018 with Plaintiff's cardiologist, Augusto E. Villa, M.D., Plaintiff reported no anxiety or depression, and a general examination of Plaintiff revealed normal findings with respect to her back and musculoskeletal system. [R. 1065–67, 1149–41].

and standing to relieve pain or discomfort, would be "off task" more than 25% of the time in an 8-hour workday, and would likely be absent from work more than three times a month. [R. 1164].

In a similar vein, on November 12, 2018, Dr. Murphy also filled out a "Medical Statement Concerning Physical Abilities & Limitations for Social Security Disability Claim." [R. 1166–68]. In her statement, Dr. Murphy indicated that Plaintiff could never sit or stand in an 8-hour workday, could lift no more than 10 pounds on an occasional or frequent basis, could never bend or stoop, could never conduct fine or gross manipulation of her left and right hand, and could occasionally raise her right and left arms over her shoulder. [R. 1166–67]. Dr. Murphy stated that: (1) Plaintiff's pain was extreme; (2) Plaintiff would require breaks every 5 minutes in an 8-hour workday; (3) Plaintiff would need to periodically alternate between sitting and standing to relieve pain every 5 minutes in an 8-hour workday; and (4) Plaintiff would be "off task" more than 25% of the time and likely absent from work more than three times a month. [R. 1167].

On November 19 and 20, 2018, Plaintiff presented to Drs. Regenbaum and Murphy, respectively, concerning her back. [R. 1183–84, 1191–93]. At her visit with Dr. Regenbaum, a general examination revealed pain with lumbar extension and a diminished range of motion in Plaintiff's lumbar spine, as well as an antalgic gait with a restricted range of motion. [R. 1184]. In contrast, at her visit with Dr. Murphy, a general examination revealed that Plaintiff had a normal gait, although Dr. Murphy noted that Plaintiff "ha[d] to move from chair to table to standing" throughout her examination. [R. 1191–93].

Pursuant to the recommendation of Dr. Regenbaum, on November 28, 2018, Plaintiff underwent another MRI of her lumbosacral spine. [R. 1186]. Walter Forman, M.D., identified

postoperative changes at L4-L5, and the same degenerative changes at L2-L3, L3-L4, and L5-S1 that had previously been identified in Plaintiff's earlier MRI. [R. 1186].

Thereafter, on December 5, 2018, Plaintiff visited Laszlo J. Mate, M.D., for an independent medical evaluation at the request of her insurance carrier. [R. 1198]. During his examination, Dr. Mate found that Plaintiff's gait, including toe and tandem gait, were within normal limits, and that Plaintiff suffered from chronic pain following a "partially successful lumbar surgery." [R. 1205]. Accordingly, although he noted that Plaintiff appeared in visible discomfort during the examination, Dr. Mate determined that Plaintiff was capable of: (1) performing at least 4 hours of light duty work, 5 days a week, without significant adverse effect on her well-being; and (2) lifting up to 20 pounds intermittently, and up to 10 pounds regularly. [R. 1204, 1206]. However, Dr. Mate stated that there was "[l]ikely . . . additional spinal pathology above the surgical level which is responsible for [Plaintiff's] symptoms." [R. 1205]. Dr. Mate felt a "more aggressive evaluation of [Plaintiff's] persistent pain would be recommended, including MRI/CT of the thoracic and lumbar spines; [and] EMG/NCV of the lower extremities for differentiation of the source of her chronic pain which might not be residual of the L4/5 level surgery." [R. 1206].

Plaintiff presented to Dr. Murphy on January 3, 2019, for a follow-up visit to discuss her medication. [R. 1195]. Dr. Murphy stated that Plaintiff was "crying for no reason" with "the depression like she had with [G]abapentin." [R. 1195]. Thus, Dr. Murphy advised Plaintiff to stop taking Lyrica and to start taking Cymbalta instead. [R. 1195]. In subsequent visits with Dr. Murphy in February of 2019, Plaintiff reported feeling better on Cymbalta, but noted the medication was

still making her "very tired." [R. 1195, 1362]. Still, though, Plaintiff continued to report chronic pain with respect to her lower back during those February visits.[15]

Pursuant to the ALJ's requirement that Plaintiff undergo a psychological consultative examination, on March 6, 2019, Plaintiff presented to Roger L. Bash, Ph.D., for a mental status examination. [R. 1337]. At the examination, Plaintiff presented with a weak gait, reporting that she was "very fatigued" and "sleeping a good deal and feeling limited motivation, possibly due to her Cymbalta." [R. 1337]. Indeed, Plaintiff reported feeling very depressed when she was taking Gabapentin and Lyrica, but stated she now felt "half dead" and lethargic on her current medication. [R. 1337].[16] Moreover, with respect to Plaintiff's pain symptoms, Plaintiff reported a reduction in pain from a 10 out of 10 to a 7 out of 10 following her surgery in November 2017. [R. 1337].

Dr. Bash found that Plaintiff was oriented in all spheres other than the precise time of day, that Plaintiff was cooperative and demonstrated good eye contact, and that Plaintiff's affect was euthymic (although he noted Plaintiff demonstrated pain behaviors during the interview). [R. 1338]. Dr. Bash further found that Plaintiff's recent memory and abstract reasoning were below average. [R. 1338]. Accordingly, based on his clinical interview, Dr. Bash diagnosed Plaintiff with somatic symptom disorder (with predominant severe spinal-based pain), stating Plaintiff's spinal injuries and corresponding pain rendered her unable to complete her professional work as a bookkeeper and photographer. [R. 1338]. While Dr. Bash stated that Plaintiff did not have an impairment with respect to her ability to understand, remember, and carry out instructions, Dr.

---

[15] Dr. Murphy noted that Plaintiff stood for her January 3, 2019 and February 5, 2019 visits. [R. 1196, 1369]. However, during Plaintiff's February 25, 2019 visit, Dr. Murphy stated that Plaintiff could not sit or stand for any length of time throughout the office visit. [R. 1363].

[16] At an appointment with Dr. Murphy two days later, Dr. Murphy advised Plaintiff to stop taking the Cymbalta and to "follow-up with pain management for possible injections." [R. 1359–60].

Bash outlined several impairments in connection with Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public. [R. 1340–41]. Specifically, Dr. Bash found that Plaintiff had marked limitations in interacting appropriately with the public and with co-workers, and moderate limitations in interacting appropriately with supervisors. [R. 1341]. Dr. Bash also took note of Plaintiff's ability to complete daily living activities except when she was having a pain flare-up. [R. 1338].

On March 11, 2019, Plaintiff visited Dr. Regenbaum for an appointment concerning her lumbar pain. [R. 1380]. A general examination of Plaintiff revealed that she was in obvious pain, with an antalgic gait and restricted range of motion. [R. 1381]. Plaintiff had tender left paraspinous muscles, a positive straight left leg raise test, and diminished sensation to light touch in her left lateral leg and foot. [R. 1381].

Pursuant to the ALJ's requirement that Plaintiff undergo another consultative examination from someone with full access to Plaintiff's medical record, on March 12, 2019, Jacob L. Lochner, D.O., performed a Social Security Disability Evaluation examination of Plaintiff. [R. 1344–48]. At that examination, Plaintiff reported pain at a level of 6 out of 10, with the pain being 5 out of 10 at best, and 10 out of 10 at worst. [R. 1344]. A physical examination of Plaintiff revealed that she was mildly anxious and mildly depressed. [R. 1346]. Moreover, Plaintiff had a slight lumbar spasm over the L2 through L4 paravertebral muscle, and a slightly slowed cadence while walking, with Plaintiff grabbing walls or door frames for support. [R. 1346]. Dr. Lochner assessed that Plaintiff had chronic pain syndrome, lumbar herniated nucleus pulposus, lumbar stenosis, lumbar degenerative disc disease, muscle spasms, lumbar radiculopathy, and mild depressive features. [R. 1347].

With respect to Plaintiff's residual functional capacity, Dr. Lochner reported that Plaintiff had the inability to stay in any position for a prolonged period of time, which he stated would make maintaining employment "at the sedentary type job description" difficult. [R. 1347]. Dr. Lochner then noted Plaintiff's exertional limitations, stating that Plaintiff could: (1) frequently lift and/or carry up to 10 pounds; (2) occasionally lift and/or carry up to 20 pounds; (3) sit for 45 minutes, stand for 30 minutes, and walk for 30 minutes, without interruption; (4) sit for a total of up to 6 hours in an 8-hour work day, stand for up 2 hours in an 8-hour work day, and walk for up to 2 hours in an 8-hour workday; and (5) frequently reach, handle, finger, feel, and push/pull using both her right and left hands. [R. 1352–54]. Dr. Lochner next assessed Plaintiff's postural limitations, stating that Plaintiff could occasionally climb stairs and ramps, could never climb ladders or scaffolds, could frequently stoop, could occasionally kneel and crouch, and could never balance or crawl. [R. 1355]. And lastly, Dr. Lochner stated Plaintiff's environmental limitations, noting that Plaintiff could only occasionally tolerate moving mechanical parts and operating a motor vehicle, and could only tolerate moderate noise. [R. 1356]. However, Dr. Lochner—like Dr. Bash—assessed no limitations on Plaintiff's daily living activities. [R. 1353].

On April 4, 2019, Plaintiff underwent another CT scan of her lumbar spine. [R. 1383]. Dr. Cortinas analyzed the CT scan and identified the following:

1. Postoperative changes at L4-5 with dual posterior transpedicular fusion hardware identified and dual disc implants. There is no evidence of loosening, subsidence or infection.
2. The anterior aspect of the left-sided LS screw projects through the anterior aspect of the vertebral body by 3.4 mm. No retroperitoneal hematoma or other complication is identified.
3. Stable concentric disc bulges at L2-3, L3-4, and L5-S1, narrowing the lateral recesses at L2-3 and L3-4.
4. Stable Schmorl's nodes at L3-4.

[R. 1383–84]. Additionally, on April 11, 2019, Plaintiff had another x-ray taken of her lumbosacral spine. [R. 1400]. Dr. Forman, the interpreting radiologist, noted that there was a "scoliotic curvature of the spine concave toward the right side" and that "degenerative disc change is seen at the L2-L3 and L3-L4 disc spaces." [R. 1400]. He stated that the degenerative change at L2-L3 was new since Plaintiff's May 30, 2018 x-ray. [R. 1400].

With the new imaging results, on April 29, 2019, Plaintiff presented to Dr. Wang, for an evaluation of her lumbar spine. [R. 1386, 1388]. Dr. Wang noted that, despite Plaintiff's November 2017 surgery, "she still has significant pain and limitation." [R. 1386]. He stated that Plaintiff could only "walk about 30 minutes now instead of 10." [R. 1386]. Moreover, Dr. Wang noted that Plaintiff's recent x-ray revealed degeneration and asymmetric disc height loss at L2-3, L3-4, and L5-S1. [R. 1386]. Dr. Wang diagnosed Plaintiff with degenerative disc disease in her lumbar spine, lumbar radicular pain, and "S/P lumbar fusion." [R. 1388].

On May 24, 2019, Plaintiff presented to Joshua Leibner, M.D., for a consultation on her lumbar radiculopathy. [R. 1401]. Plaintiff reported that her pain was "primarily in the back radiating down through the back of her leg and sometimes going all the way down [her] left leg." [R. 1410]. Further, Plaintiff stated that her pain worsened when sitting down and walking, and that she felt comfortable primarily with lying down. [R. 1410, 1413]. Dr. Leibner agreed with Dr. Forman's interpretation of Plaintiff's November 28, 2018 MRI, concluding that Plaintiff had degenerative changes at L2-L3, L3-L4, and L5-S1. [R. 1413]. He noted that Plaintiff would get an electromyography and undergo a nerve conduction study. [R. 1413].

Thereafter, on July 17, 2019, Plaintiff underwent electromyography and nerve conduction studies of the bilateral lower extremities. [R. 1449–52]. Hildegarde Geisse, M.D., determined that

there was left L5/S1 root dysfunction in Plaintiff's spine. [R. 1449–52].[17] Thus, on August 5, 2019, Plaintiff followed up with Dr. Leibner. [R. 1421]. At that appointment, Plaintiff continued to report pain radiating down her left leg while sitting, and she had a mildly antalgic gait. [R. 1431, 1426]. Dr. Leibner assessed left lumbosacral radiculopathy and recommended following up with "pain management" regarding a spinal cord stimulator. [R. 1426].

Lastly, on August 6, 2019, Plaintiff presented to Louis J. Raso, M.D., for her back pain. [R. 1415]. Plaintiff's primary complaint was lower back pain radiating to her left leg thigh area, which was sharp, shooting, and radiating. [R. 1415]. Plaintiff also reported difficulty walking and mild anxiety or depression. [R. 1415–16]. An objective examination of Plaintiff revealed major tenderness and an abnormal range of motion in Plaintiff's spine, as well as abnormal symmetry, tone, strength, and range of motion in her musculoskeletal system. [R. 1418]. Additionally, Plaintiff's gait was moderately antalgic, and she had a positive straight leg raise test. [R. 1418]. Accordingly, Dr. Raso diagnosed Plaintiff with lumbar radiculopathy, lumbago with sciatica of the left side, chronic lower back pain, lumbar disc degenerative disease, generalized chronic body aches, lumbar spinal stenosis, muscle spasms of the back, and pain in the lower back. [R. 1418]. He determined that a dual lead spinal cord stimulator implant was medically necessary. [R. 1419].

## C. The ALJ's Decision

The ALJ issued a decision denying Plaintiff's claim for benefits on November 7, 2019. [R. 15–40]. In doing so, the ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 19–20]. At step one, the ALJ found that Plaintiff had not

---

[17] On July 15, 2019, Plaintiff visited Dr. McKeen. There, she reported no anxiety or depression, and stated that she was constantly lying in bed because of her severe pain. [R. 1441–43].

engaged in substantial gainful activity since January 31, 2017, the alleged onset date. [R. 20]. At step two, the ALJ found that Plaintiff suffers from the following severe impairments: lumbar herniated nucleus pulposus, lumbar stenosis, lumbar degenerative disc disease with radiculopathy, chronic pain syndrome, and muscle spasm. [R. 21].

However, at step two, the ALJ also specifically noted that Plaintiff's "medically determinable mental impairments of somatic symptom disorder and depression" were non-severe. [R. 21]. In making this finding, the ALJ determined that Plaintiff's mental impairments resulted in a "mild" limitation in two of the four broad functional areas of mental functioning (or, "paragraph B" criteria). [R. 21]. Specifically, the ALJ identified that Plaintiff had "mild" limitations in interacting with others and "mild" limitations in concentrating, persisting, or maintaining pace, but no limitations in understanding, remembering, or applying information, or in adapting or managing herself. [R. 21–22]. At this part of the decision, the ALJ acknowledged the opinion of psychological consultative examiner, Dr. Roger Bash—who concluded that Plaintiff was moderately-to-markedly impaired in interacting with others—but found the opinion unpersuasive due to Plaintiff's cooperative behavior during Dr. Bash's in-person examination and based upon Plaintiff's "lack of mental health treatment and lack of signs of mental impairments when not related to medication side effects." [R. 21–22].

At step three, the ALJ found that Plaintiff's impairments individually or in combination did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 22]. At step four, the ALJ then found that Plaintiff had the residual functional capacity ("RFC") to:

> lift and/or carry 20 pounds occasionally, 10 pounds frequently; can sit for six hours per eight-hour workday, but only for 45 minutes at a time; can stand and walk for

four hours in an eight-hour workday, but only for 30 minutes at a time; should be allowed to alternate between sitting and standing as needed, at least every 45 minutes, to stand and walk for a few minutes; can frequently stoop; can occasionally climb stairs or ramps, kneel, or crouch; can never climb ladders, ropes, or scaffolds, balance, or crawl; should avoid all exposure to extreme cold, extreme heat, humidity and wetness, vibrations, dust, odors, fumes, poor ventilation, pulmonary irritants, and unprotected heights; can tolerate office-level noise; should avoid even moderate exposure to moving mechanical parts, and operating a motor vehicle; can frequently perform all functions with the bilateral upper extremities; and can frequently operate foot controls with the bilateral lower extremities.

[R. 22–23]. The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all the opinion evidence and prior administrative medical findings. [R. 23]. The ALJ next followed the two-step process—first, determining if there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. [R. 23].

The ALJ summarized Plaintiff's pre-hearing statements and hearing testimony and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [R. 23]. For instance, the ALJ noted that the medical record evidence showed that Plaintiff consistently reported an improved condition following surgery and that her gait, lower extremity strength, and range of motion had all generally been within normal limits or slightly limited on examination following surgery. [R. 23]. The ALJ went on to summarize the medical evidence regarding Plaintiff's physical

impairments. [R. 23–26]. The ALJ also expressly considered medical opinions from various medical sources and provided reasoning for finding each opinion either persuasive, unpersuasive, or partially persuasive. [R. 26–29]. Ultimately, the ALJ concluded that his RFC assessment "is supported by [Plaintiff's] consistent reports that her condition improved following surgery, and [Plaintiff's] gait, lower extremity strength, and range of motion all generally being either within normal limits or slightly limited on examination following surgery, as well as the persuasive and partially persuasive opinions identified." [R. 29].

At the conclusion of step four, the ALJ found that Plaintiff could return to her past relevant work as a bookkeeper. [R. 29–30]. The ALJ noted his reliance on the vocational expert's testimony in this regard and that such testimony was consistent with the information found in the DOT. [R. 30]. The ALJ thus ended the analysis at step four and concluded that Plaintiff was not under a disability as defined in the Social Security Act from January 31, 2017, through the date of the ALJ's decision. [R. 30].

## II. <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In her Amended Motion for Summary Judgment, Plaintiff makes four arguments. [DE 24 at 1]. First, Plaintiff argues that the ALJ failed to properly consider her medically determinable non-severe mental impairments as part of the RFC finding and step four determination that Plaintiff could perform her past relevant work in bookkeeping. *Id.* at 4–7. Second, Plaintiff argues that the ALJ did not properly evaluate Plaintiff's mental impairment and erred in rejecting the opinion of the consultative examining psychologist. *Id.* at 7–10. Third, Plaintiff argues the ALJ did not properly evaluate the medical source opinions regarding Plaintiff's physical limitations.

*Id.* at 11–17. And fourth, Plaintiff argues the ALJ's decision does not demonstrate sufficient consideration of Plaintiff's subjective allegations and pain. *Id.* at 17–20.

In Defendant's Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment, Defendant contends that substantial evidence supports the ALJ's assessment of Plaintiff's mental functioning and subjective complaints. [DE 32 at 4–13]. Defendant further contends that the ALJ properly discussed the supportability and consistency of each medical opinion under the new regulatory framework that applies to applications for benefits made on or after March 27, 2017. *Id.*

In reply, Plaintiff first contends that Defendant provides no meaningful response to her argument that the ALJ erred in failing to consider the ALJ's own finding of Plaintiff's "mild" mental limitations when determining that Plaintiff could perform her past relevant work as a bookkeeper. [DE 38 at 1–2]. Second, Plaintiff argues that Defendant fails to respond to her argument that the ALJ employed a flawed rationale when rejecting the findings of Dr. Bash, the psychological consultative examiner. Third, Plaintiff reiterates that the ALJ failed to properly evaluate the medical source opinions regarding Plaintiff's physical limitations. *Id.* at 2–3. For instance, regarding the post-surgical June 2018 opinion of treating neurosurgeon Dr. Wang, Plaintiff contends that Defendant does not dispute that the ALJ did not address or weigh this opinion and "[i]t is unclear why the opinion was inconsequential such that it need not be assessed, yet purportedly provided substantial evidence in support of the ALJ's other findings." *Id.* at 4. Fourth, Plaintiff asserts that the ALJ's unsupported rejection of Plaintiff's subjective allegations of pain and limitations was the result of a flawed determination meriting remand. Lastly, Plaintiff

argues that "[t]he new regulatory framework does not require the rejection of all case law relating to medical sources." *Id.* at 7.[18]

## III. RELEVANT LAW

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient

---

[18] Plaintiff argues in her Motion for Summary Judgment that, "[t]o the extent the Commissioner may assert that, for claims filed on or after March 27, 2017, longstanding case law from both this circuit and all others relating to treating source opinions no longer applies as a result of 20 C.F.R. § 404.1520c, such an extreme position should be rejected." [DE 24 at 11]. Plaintiff states that "[t]he new regulation does not render established case law relating to the weighing of opinion evidence irrelevant or contradictory to the new regulation." *Id.* Thereafter, in Defendant's Motion for Summary Judgment/Response, Defendant discusses this argument at length, contending that "Plaintiff's reliance on prior 11th Circuit[] case law related to the treating physician rule is misguided because that case law does not apply under the new regulations." [DE 32 at 20–22]. And in Plaintiff's Reply, Plaintiff then argues "[t]he new regulatory framework does not require the rejection of all case law relating to medical sources, nor need this issue be addressed here." [DE 38 at 7]. Plaintiff also states that the issue "is not applicable to the case at bar." *Id.* at 8. The Undersigned agrees. Because the parties' dispute on this matter is irrelevant and in no way outcome determinative, the Court will not address an argument that Plaintiff herself agrees this Court need not address.

reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (alteration in original) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)–(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix 1. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education,

and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F.3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, appendix 2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F.3d at 1239–40.

## IV. <u>ANALYSIS</u>

Under the above legal framework, the Court will address the issues raised in this appeal. To resolve these issues, the Court has carefully reviewed the extensive administrative record, including the objective medical evidence, and will discuss the relevant portions as necessary to address each issue.

A. <u>Whether the ALJ Failed to Consider Plaintiff's Medically Determinable Mental Impairments in Crafting Plaintiff's RFC</u>

Plaintiff asserts that the ALJ did not properly consider his own finding of "mild" mental functional limitations caused by non-severe "depression and anxiety," non-severe "somatic symptom disorder," and severe "chronic pain syndrome" in crafting Plaintiff's RFC. [DE 24 at 3–4]. Stated differently, Plaintiff argues that the "ALJ's finding of a mild limitation in concentrating, persisting or maintaining pace and [in] interacting with others" was not properly considered by the ALJ when determining Plaintiff's RFC. *Id.* at 7. Plaintiff also contends that the ALJ failed to consider the effect these limitations had on Plaintiff's ability to perform her past relevant "*skilled* work as a bookkeeper*" as opposed to basic mental work. *Id.* at 5.

Defendant argues that the ALJ did consider Plaintiff's "mild" mental functional limitations, noting that "non-severe impairment[s] . . . [do] not significantly limit a person's physical or mental ability to do basic work activities." [DE 32 at 8]. As such, Defendant asserts that Plaintiff's mild mental limitations in interacting with others and in concentrating, persisting, or maintaining

pace—which the ALJ found to be non-severe—are not impairments that could prevent Plaintiff from "perform[ing] her past work as a bookkeeper." *Id.*

In reply, Plaintiff first notes that Defendant "does not appear to provide a meaningful response to Plaintiff's assertion of error." [DE 38 at 1]. Plaintiff then repeats her assertion that the ALJ "erred in failing to consider [her mild mental] functional limitations before finding that [she] could perform her past relevant skilled work as a bookkeeper." [DE 38 at 1]. Plaintiff also argues that Defendant does not "appear to dispute that mild mental limitations would interfere with Plaintiff's ability to perform her past relevant skilled work" and that "remand is merited" to consider Plaintiff's severe and non-severe impairments in determining her RFC. *Id.* at 2.

Under 20 C.F.R. § 404.1545(a)(2), the Commissioner is required to consider all medically determinable impairments (both mental and physical), including "medically determinable impairments that are not 'severe,'" when assessing a claimant's residual functional capacity. Indeed, the Eleventh Circuit has made clear that, even if "mental impairments [are] non-severe, the ALJ [is] still required to consider them when assessing the claimant's RFC." *Pupo v. Comm'r of Soc. Sec. Admin.*, 17 F.4th 1054, 1064 (11th Cir. 2021); *see also Schink v. Comm'r of Soc. Sec. Admin.*, 935 F.3d 1245, 1268 (11th Cir. 2019) ("Consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC."). "The ALJ must also consider a claimant's medical condition taken as a whole." *Schink*, 935 F.3d at 1269.

In *Schink*, an ALJ determined that a social security claimant "suffered from various physical impairments that were severe," as well as from bipolar disorder, which the ALJ found to be non-severe. *Id.* at 1256. Thereafter, despite the ALJ's assertion that he had "considered all symptoms" when assessing the claimant's RFC, the "content of his decision demonstrate[d that]

he did not," as "[n]early the entire section of the ALJ's opinion relating to RFC discusse[d] the claimant's physical impairments," with no mention of the claimant's mental impairments. *Id.* at 1269. While the ALJ's decision did mention that the claimant "had bipolar disorder, the decision contain[ed] no real discussion of how the mental condition affected [the claimant's] RFC." *Id.*

Accordingly, because consideration of all impairments (whether severe or non-severe) is required when determining a claimant's RFC, the Eleventh Circuit held that, "[e]ven the most favorable interpretation of the ALJ's opinion—namely, that the ALJ considered [the claimant's] mental conditions in the RFC assessment *sub silentio* and implicitly found that they imposed no significant limitations on his work-related mental capacities—would not permit" the court to affirm. *Id.* This was because "the ALJ's 'failure . . . to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis ha[d] been conducted mandate[d] reversal' in its own right." *Id.* (quoting *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1065, 1066 (11th Cir. 1994)).

Here, the instant case is entirely analogous to *Schink*. At step two, the ALJ identified somatic symptom disorder and depression as Plaintiff's medically determinable mental impairments. [R. 21]. The ALJ then determined that the mental impairments were non-severe, after consideration of the "paragraph B" criteria. [R. 21]. In doing so, the ALJ detailed Plaintiff's bouts of depression as a side effect of her medication, and discussed the opinion of Dr. Bash, Plaintiff's psychological consultative examiner. [R. 21]. But importantly, the ALJ stated (using the same language as in *Schink*), that the "limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." [R. 22; *Schink*, 935 F.3d at 1269]. The ALJ

then acknowledged "[t]he mental residual functional capacity used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments." [R. 22; *Schink*, 935 F.3d at 1269].

However, in the ALJ's actual RFC analysis at step four, he did not even mention Plaintiff's depression or include a single finding about her mental capacities in relation to such, despite statements that he had "considered all symptoms." [R. 23–29]. Moreover, while the ALJ addressed Plaintiff's subjective allegations of pain (and therefore presumably Plaintiff's somatic symptom disorder), he did so only in the context of Plaintiff's physical examination results and did not address the "paragraph B criteria." [R. 23–29]. Thus, the ALJ provided no "real assessment" of how Plaintiff's depression or other mental impairments affected her ability to work. And, as in *Schink*, even assuming "the RFC assessment conducted by the ALJ included some silent consideration of [Plaintiff's] mental impairments, [this Court] has no way of knowing whether it included the 'more detailed assessment' required." *See Schink*, 935 F.3d at 1269.

"Whether severe or not, the ALJ was required to explicitly consider [Plaintiff's] mental impairments when assessing the RFC but failed to do so." *Mitchell v. Comm'r of Soc. Sec.*, No. 20-cv-236, 2021 WL 4305088, at *6 (M.D. Fla. Sept. 22, 2021). In other words, "the ALJ failed to expressly construct a logical bridge between his finding that [Plaintiff] had mild impairments in . . . areas of mental functioning and yet no limits whatsoever in the mental functions associated with work." *Id.* Accordingly, reversal is warranted, and on remand, "the ALJ should also review the RFC to include any non-severe [or severe] mental impairments that could affect Plaintiff's

ability to perform skilled past relevant work." *Harrison v. Berryhill*, No. 16-CV-81492, 2018 WL 1466088, at *6 n.4 (S.D. Fla. Feb. 12, 2018).[19]

B.  Whether Substantial Evidence Supports the Omission of Mental Limitations from Plaintiff's RFC

Plaintiff argues that her "mental impairments of somatic symptom disorder and depression, as well as mental functional limitations related to the interaction between the mental impairments and chronic pain syndrome, were not sufficiently considered by the ALJ." [DE 24 at 7]. To this end, Plaintiff argues that "[t]he ALJ's conclusion that Dr. Bash's opinion was unsupported and inconsistent with the evidence, as well as the ALJ's conclusion that 'the record is consistent with no-more-than-mild limitations' was based entirely on the ALJ's lay assessment of both the record and Dr. Bash's report." *Id.* at 8. And, Plaintiff argues that, "given the linkage between Plaintiff's pain and her mental functional impairments, and the ALJ's acknowledgement that Plaintiff's 'chronic pain syndrome' was a severe impairment[,] . . . the ALJ's finding that Plaintiff's somatic symptom disorder' [was non-severe] based on the same pain creates an internal conflict in the decision." *Id.* at 10.

Defendant argues that substantial evidence supports the ALJ's assessment of Plaintiff's mental functioning. [DE 32 at 4]. Specifically, Defendant states that the ALJ "fully considered Plaintiff's medical[ly] determinable mental impairments of depression and somatic symptom disorder and properly found that the[] impairments did not cause more than minimal limitations

---

[19] While not the primary focus of Plaintiff's argument, Plaintiff does note that "[c]ase law requires that the RFC and hypotheticals posed to the Vocational Expert include all of Plaintiff's medically supported impairments, both severe and *non-severe*." *Harrison v. Berryhill*, No. 16-CV-81492, 2018 WL 1466088, at *6 n.4 (S.D. Fla. Feb. 12, 2018). Here, the ALJ found mild limitations in Plaintiff's mental functioning in his written decision. Yet, during the October 15, 2019 hearing, the ALJ stated that he found "no medical basis that [Plaintiff] would have difficulty in social function" and did not pose a hypothetical including any mental limitation. [R. 1483–84]. Thus, on remand, the ALJ should ensure that accurate hypotheticals are posed to the Vocational Expert.

on Plaintiff's ability to perform basic mental work activity and were therefore not severe." [R. 32 at 4]. Defendant points to Plaintiff's "complete lack of psychological treatment," her mental status examinations that were within normal limits, and to Dr. Bash's "inconsistent" opinion in support. *Id.* at 5–7. Moreover, as to Dr. Bash's opinion, Defendant argues that "Plaintiff's assertion that the ALJ had to rely on a medical opinion to assess her mental functioning . . . flies in the face of the ALJ's role." *Id.* at 7.[20]

In reply, Plaintiff again argues that Dr. Bash's opinion should not be dismissed as unpersuasive and should be considered, as Plaintiff was only examined by Dr. Bash at the recommendation of the ALJ. [RE 38 at 2]. In this regard, while Plaintiff acknowledges that the ALJ is not required to adopt the findings of a consultative examiner, Plaintiff argues that "the regulations do require a basis for the ALJ's findings." *Id.*

With respect to the medical evidence of record, the Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion" but is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 F. App'x 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The law regarding how much deference to give treating physicians has changed for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. Here, Plaintiff's claim was filed after March 27, 2017, and therefore the new regulations apply. The new regulations, which omit entirely the term "treating source," state that the ALJ "will not

---

[20] Defendant also notes that Plaintiff "did not even allege mental capacity limitations in her application nor in her hearings in front of the ALJ." [DE 32 at 6]. Defendant thereafter cites cases for the proposition that the ALJ was under no duty to consider a non-alleged impairment. *Id.* However, the ALJ found certain non-severe mental limitations in his written decision. Thus, because the ALJ addressed those limitations, so too will the Court.

defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." § 404.1520c(a). Instead, all medical opinions are to be evaluated according to the factors listed in § 404.1520c(c), of which the most important are the supportability and consistency of the medical opinion. *See id.* Moreover, the ALJ is not required to articulate how he or she "considered each medical opinion or prior administrative medical finding from one medical source individually." 20 C.F.R. § 404.1520c(b)(1).

Supportability refers to the relevance of "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her" opinion. 20 C.F.R. § 404.1520c(c)(1). Consistency looks to whether "the evidence from other medical sources and nonmedical sources in the claim" are consistent with the medical opinion presented. 20 C.F.R. § 404.1520c(c)(2). The other factors, which the ALJ is not required to consider, § 404.1520c(b)(2), concern the medical source's relationship with the claimant, § 404.1520c(c)(3), the medical source's specialization, § 404.1520c(c)(4), and any "other factors that tend to support or contradict a medical opinion." § 404.1520c(c)(5); *see also Bonilla v. Saul*, No. 19-25323-CIV, 2020 WL 9048787, at *4–5 (S.D. Fla. Oct. 23, 2020), *report and recommendation adopted*, No. 19-CV-25323, 2021 WL 1198296 (S.D. Fla. Mar. 30, 2021).

Thus, under the revised regulations, which the Court is applying in this case, the ALJ must articulate how persuasive he or she finds the medical opinions in the record and specify how he or she considered the supportability and consistency factors for a medical source's opinion. *See* 20 C.F.R. § 404.1520c(b). If the ALJ finds that two or more medical opinions are equally well-supported and consistent with the record but are not necessarily the same, the ALJ must articulate how the ALJ considered other persuasive factors. *See* 20 C.F.R. § 404.1520c(b)(3).

Here, the ALJ found that the March 6, 2019 opinion of Dr. Bash was not persuasive with respect to Plaintiff's mental impairment because it was unsupported and inconsistent with the medical record evidence. [R. 21–22]. The ALJ specifically noted that Dr. Bash's opinion—in which Dr. Bash opined that Plaintiff was "moderately-to-markedly impaired in interacting with others"—was "not supported by his own in-person examination of [Plaintiff], where [Plaintiff] displayed cooperative behavior, good eye contact, euthymic affect, and social judgment with normal limits." [R. 21]. The ALJ also noted that, rather than moderate or marked impairments, the record was "consistent with no-more-than-mild limitations, as evidenced by [Plaintiff's] lack of mental health treatment and lack of signs of mental impairments when not related to [a] medication side effects specialist." [R. 21–22].

In considering social security appeals, courts are not permitted to "decide the facts anew, make credibility determinations, or reweigh the evidence." *Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 145 (11th Cir. 2021) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011)). While the Court is cognizant of this body of law, and follows it here, the Court notes that several of the ALJ's findings concerning Plaintiff's mental impairment are problematic.

First, to the extent the ALJ utilized Plaintiff's lack of ongoing treatment for depression and "lack of mental impairments when not related to medication side effects" as a basis to discredit the supportability and consistency of Dr. Bash's opinion, it does not appear that such a basis is supported by substantial evidence. The record is threadbare concerning Plaintiff's depression and its corresponding mental limitations. Plaintiff first complained of feeling "depressed" on June 7, 2018, but only in the context of her current situation—that is, Plaintiff's chronic back pain. [R.

873]. Thereafter, Plaintiff reported depression in connection with her Gabapentin medication on August 13, 2018, and in connection with her Lyrica medication on January 3, 2019 (which she was only taking in the first instance because of pain symptoms). [R. 1047–49, 1195]. On March 6, 2019, Plaintiff then described feeling "half dead" while taking Cymbalta (which she was also taking because of her allegations of pain). [R. 1337]. And, on March 12, 2019, and August 6, 2019, Plaintiff noted that she was depressed in her examinations before Drs. Lochner and Raso, respectively. [R. 1346, 1415–16]. But during those examinations, Plaintiff described pain that was either elevated or sharp. [R. 1346, 1415]. Thus, it appears Plaintiff's depression is arguably linked with her pain symptoms, for which it is undeniable that Plaintiff actively sought *extensive* medical intervention. Moreover, Plaintiff reported pain at nearly every medical appointment, independent of any medication side effect.

Next, to the extent the ALJ rejected Dr. Bash's opinion that Plaintiff had moderate to marked impairments in interacting with others based on Dr. Bash's in-person examination of Plaintiff—in which Plaintiff "displayed cooperative behavior, good eye contact, euthymic affect, and social judgment within normal limits"—such rejection also does not appear to be supported by substantial evidence. In *Castro v. Acting Commissioner of Social Security*, 783 F. App'x 948 (11th Cir. 2019), an ALJ had concluded a psychiatrist's opinion that a claimant "had a poor ability to use judgment was contradicted by hospital records indicating that [the claimant] had good judgment and comprehension." *Id.* at 957. However, the Eleventh Circuit noted that "[a] closer look at the hospital record show[ed] no inconsistency." *Id.* at 957. As noted by the court:

> The hospital physician determined that [the claimant] had good judgment and comprehension because [the claimant] was able to explain why people say hello to a cashier at a store. Viewed in context, the physician was offering an opinion about [the claimant's] ability to exercise judgment or comprehension to determine

> whether, after reporting suicidal ideation, she should be admitted to the hospital or
> released. No reasonable person would accept this assessment as adequate to support
> a conclusion that [the claimant] would exercise good judgment or comprehension
> in a work environment. Given this context, we find substantial evidence does not
> support the ALJ's conclusion that the hospital physician's notes contradicted [the
> psychiatrist's] opinion that in a work environment [the claimant] would have a poor
> ability to use judgment.

*Id.* at 957–58; *see also Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1108 (11th Cir. 2021)

("[W]hen evaluating a claimant's medical records, an ALJ must take into account the fundamental

differences between the relaxed, controlled setting of a medical clinic and the more stressful

environment of a workplace."). Here, in a similar vein, Plaintiff's cooperative behavior, good eye

contact, euthymic affect, and normal social judgment had little to no bearing on Plaintiff's

impairments in interacting with others in a work environment, especially considering that Plaintiff

reported pain symptoms that would frequently vary and cause her to change positions and lie down

for pain relief.

Further, beyond the ALJ's problematic findings, the ALJ's need for a consultative

examination—and his ensuing rejection of such consultative examination, without more—raises

concerns. "In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order

a consultative examination unless the record establishes that such an examination is necessary to

enable the ALJ to render an informed decision." *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1255–

56 (M.D. Fla. 2005). "[I]t is reversible error for an ALJ not to order a consultative examination

when such an evaluation is necessary for him to make an informed decision." *Good v. Astrue*, 240

F. App'x 399, 404 (11th Cir. 2007).

Here, considering that the record was scant as to Plaintiff's mental limitations (seemingly

with only Dr. Lichtblau opining that Plaintiff would be unable to perform at a consistent pace, and

Dr. Bash opining that Plaintiff had moderate to marked impairments in her ability to interact appropriately with supervisors, co-workers, and the public),[21] and considering that the ALJ apparently found it necessary to order a consultative examination with respect to Plaintiff's psychological condition, it is somewhat concerning to the Court that the ALJ would summarily reject Dr. Bash's consultative examination as being unsupported and inconsistent, without further inquiry. Accordingly, while the Court need not explicitly determine whether substantial evidence supports the ALJ's omission of mental limitations from Plaintiff's RFC—as the ALJ must necessarily address both Plaintiff's severe and non-severe limitations on remand when crafting his RFC[22]—the Court trusts that on remand the ALJ will ensure that Plaintiff's mental limitations are sufficiently and adequately addressed.[23]

    C.  <u>Whether Substantial Evidence Supports the Physical Limitations Included in Plaintiff's RFC</u>

Plaintiff argues that the ALJ failed to properly evaluate the medical source opinions regarding Plaintiff's physical limitations by relying predominantly upon a non-examining physician's opinion and discounting some or all of the medical conclusions formed by multiple examining physicians. [DE 24 at 11–12]. Specifically, Plaintiff asserts that the ALJ relied upon conclusions formed by Dr. Fuchs who is a non-examining physician and who did not review the entire medical record in light of his February 7, 2019 testimony (which occurred before a significant portion of the medical record evidence). *Id.* at 12-13.

---

[21] [R. 1163, 1341].

[22] *See Dieffenbach o/b/o Dieffenbach v. Comm'r of Soc. Sec.*, No. 21-80342-CIV, 2022 WL 3444999, at *8 (S.D. Fla. Aug. 17, 2022), and cases cited therein.

[23] On remand, the ALJ should also clarify the distinctions between Plaintiff's chronic pain syndrome and somatic symptom disorder, and the corresponding limitations.

Defendant responds that the ALJ properly evaluated the medical source opinions by considering the supportability and consistency of each opinion under the new regulatory framework. [DE 32 at 22–25]. To this end, Defendant first asserts that Dr. Fuchs' opinion was "well supported and consistent with the record." *Id.* at 22. Defendant continues by offering rationale for finding the opinions of other doctors either somewhat persuasive, or not persuasive. *Id.* at 22–25. Defendant concludes by stating that this Court should not reweigh the evidence, and should "defer[] to the presiding ALJ, who has seen the hearing up close." *Id.* at 25 (alteration in original) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1156 (2019)).

In reply, Plaintiff asserts that Defendant failed to provide specific reasoning for the ALJ's rejection of Dr. Lochner's and Dr. Lichtblau's opinions. [DE 38 at 3]. Plaintiff further argues that the ALJ failed to adequately consider Dr. Wang's treatment records. *Id.* at 3–4. Next, Plaintiff contends that Defendant has failed to provide "clear rationale" as to why the ALJ selectively rejected portions of the opinions of Drs. Gomez, Murphy, Dakwar, and Leibner. *Id.* at 4–5. Finally, Plaintiff again challenges the supportability of Dr. Fuchs' opinion. *Id.* at 4.

As stated earlier, an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion" but is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud*, 166 F. App'x at 418–19 (citing *Bloodsworth*, 703 F.2d at 1240; *Sharfarz*, 825 F.2d at 279). Under the new regulations, all medical opinions are to be evaluated according to the factors listed in § 404.1520c(c), of which the most important are the supportability and consistency of the medical opinion. *See* § 404.1520c(a). And, when reviewing the ALJ's factual findings for substantial evidence, courts are not permitted to

"decide the facts anew, make credibility determinations, or reweigh the evidence." *Porto*, 851 F. App'x at 145 (citing *Winschel*, 631 F.3d at 1178).

Here, the ALJ discussed the medical record evidence in detail and weighed the supportability and consistency of the medical opinions. [R. 23–29]. The ALJ found Dr. Fuchs' opinion—that Plaintiff could "perform sedentary, and perhaps even light work"—supportable and consistent with the record because Dr. Fuchs' opinion was "supported . . . with numerous references to the record . . . stating that following [Plaintiff's] back surgery, [Plaintiff] repeatedly demonstrated findings within normal limits on examinations, including a normal gait and good strength." [R. 1461–65, 26]. The ALJ also found Dr. Fuchs' opinion persuasive as evidenced by Plaintiff's range of motion "being . . . within normal limits or slightly limited on examination following surgery." [R. 26].

In contrast, the ALJ found the opinions of Drs. Lichtblau, Mate, Lochner, and Gomez partially persuasive and only somewhat supportable and consistent with the record. To this end, the ALJ rejected several of said doctors' stated limitations in light of Plaintiff's "gait, lower extremity strength, and range of motion all generally being either within normal limits or slightly limited on examination following surgery." [R. 26–28] (stating the same as to all four doctors). Additionally, the ALJ found the opinions of Drs. Machado, Regenbaum, Murphy, Dakwar, Leibner, Lenard, and Wang unpersuasive and lacking supportability and consistency with the record. [R. 26–29]. With respect to Drs. Machado and Regenbaum, this was largely because the opinions were before Plaintiff's November 2017 surgery. [R. 26–29]. With respect to the opinions of Drs. Dakwar and Leibner, this was because the opinions "lack[ed] specificity regarding the extent of the limitations opined." [R. 29]. And, with respect to the opinions of Drs. Lenard, Wang,

and Murphy, this was because the opinions either indicated Plaintiff was disabled, or failed to describe the extent of Plaintiff's limitations. [R. 29].[24]

Accordingly, stated differently, the ALJ found Dr. Fuch's opinion persuasive, and found certain portions of the opinions of Drs. Lichtblau, Mate, Lochner, and Gomez unpersuasive primarily because of Plaintiff's gait, lower extremity strength, and range of motion being "within normal limits or slightly limited . . . following surgery." [R. 23–29]. The problem with this rationale, however, is that, even before Plaintiff's November 2017 surgery, Plaintiff at times reported a normal gait and motor testing at "5/5 in both lower extremities." [R. 489] (describing Dr. Gomez's February 15, 2017 examination results). And, while both before and after her surgery Plaintiff occasionally had a normal or slightly limited gait, lower extremity strength, and range of motion, Plaintiff's major issue was her chronic pain, which resulted in her frequently needing to change positions and lie down, as evidenced by the opinions of multiple examining physicians and their opined limitations.

In this regard, the record evidence is legion that Plaintiff continued to report pain following her November 2017 surgery. [R. 1012–13, 1138, 948–50, 1070–1108, 1173, 872, 1005–07, 1134–36, 1038, 1035, 1164, 1184, 1204, 1337, 1381, 1344, 1386, 1410, 1426–31, 1415]. That Plaintiff may have had a normal gait, strength in her lower extremities, and normal range of motion is not necessarily determinative of her physical limitations in this case. But in any event, there were multiple instances when Plaintiff did *not* have a normal gait or range of motion, or instances when Plaintiff had abnormal test results concerning her back *after* her November 2017 surgery. [R.

---

[24] The ALJ also found several other bases to discredit the opinions of Dr. Murphy. One of her opinions was from before Plaintiff's November 2017 surgery. [R. 28]. Another opinion cited to Plaintiff's "failed" back surgery, for which the ALJ noted that "the record does not reflect that [Plaintiff's] back surgery failed." [R. 29].

1012–13 (abnormal range of motion), 875 (positive straight leg raise test), 1184 (abnormal gait and range of motion), 1381 (abnormal gait and range of motion), 1346 (abnormal gait), R. 1415 (abnormal gait, range of motion, strength, and tone)]. Thus, the ALJ's actions in primarily relying upon Plaintiff's gait, lower extremity strength, and range of motion to weigh the persuasiveness of several doctors' opinions—while minimizing several doctors' opinions on Plaintiff's need to frequently change positions for pain management—is problematic.

  With that being said, it is also concerning that certain of Dr. Wang's treatment notes were included in the record but not exhibited. [R. 102–04]. And, it is somewhat odd that the ALJ would rely on Dr. Fuchs' medical opinion as the only opinion that was *fully* supportable and consistent with the record considering that Dr. Fuchs did not have the benefit of examining the full medical record evidence. Given the numerous partially or fully discredited medical opinions, it appears more likely that it was *Dr. Fuchs'* medical opinion that was not fully supportable or consistent with the record. Indeed, it is difficult to discern how Plaintiff's exams "have been very, very satisfactory" both "pre and post-operatively," as stated by Dr. Fuchs. [R. 1461]. Accordingly, while the Court also declines to make a finding as to whether substantial evidence supports the physical limitations included in Plaintiff's RFC (since the ALJ must again consider Plaintiff's severe and non-severe limitations when crafting Plaintiff's RFC), on remand, the ALJ should consider the non-exhibited treatment notes from Dr. Wang and should clarify his analysis of the medical source opinions after taking into account the Court's concerns as stated herein. The Court expresses no opinion as to what the ALJ's decision should be on remand, but does require a proper analysis of the medical source opinions by the ALJ.

D.  Whether Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Subjective
    Complaints

As part of Plaintiff's last argument, Plaintiff argues that the ALJ's "decision does not

contain a sufficient assessment of subjective symptoms and pain corresponding to Plaintiff's spinal

impairments or provide sufficient rationale for discrediting Plaintiff's allegations." [DE 24 at 17].

On this matter, Plaintiff contends that her impairments meet the *Holt* criteria. *Id.* at 18. Plaintiff

further asserts that the ALJ's "own summary of the medical evidence" does not support his finding

that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her

alleged symptoms] are not entirely consistent with the medical evidence and other evidence in the

record." *Id.* Plaintiff concludes by arguing that the ALJ mischaracterized the extent of the

limitations Plaintiff faces in daily living activities, including "the need to lie down intermittently

due to pain itself or medication effects." *Id.* at 19–20.

Defendant responds that the ALJ "properly assessed the intensity and persistence of

Plaintiff's symptoms to determine Plaintiff's remaining subjective allegations were inconsistent

with Plaintiff's objective medical evidence, the expert medical opinion of Louis Fuchs, M.D., and

Plaintiff's admitted activities." [DE 32 at 8–9]. In connection therewith, Defendant argues that

"[t]he ALJ provided substantial evidence for his evaluation when he noted that despite Plaintiff's

extreme allegations of ongoing pain, Plaintiff's medical records documented she underwent a

successful lumbar interbody fusion less than a year after her alleged onset date." *Id.* at 10.

Defendant then points to Plaintiff's "significant improvement" afterwards, and to Dr. Fuchs'

opinion, which "was consistent with the record that revealed Plaintiff had a normal gait, lower

extremity strength, and range of motion following her surgery." *Id.* at 10–12. And lastly, Defendant

claims Plaintiff's "extreme allegations" of pain were inconsistent with her reported daily activities

in which she "could still prepare meals, perform personal care, do light housecleaning, wash laundry, shop, and drive." *Id.* at 12.

In reply, Plaintiff first notes that Defendant "relies in great part on Dr. Wang's post-surgical June 2018 opinion"—which the ALJ "actually dismissed . . . as unpersuasive." [DE 38 at 5]. Plaintiff thereafter argues that the "selective citation" of Dr. Wang's findings "takes the information out of context," as "the ALJ's own medical summary acknowledged that the abnormalities at spinal levels L2-3 and L3-4 were not addressed with surgery and remained the same" and that a July 2019 nerve conduction study "did suggest left L5-S1 nerve root dysfunction." *Id.* at 6. Thus, Plaintiff argues that "[t]he ALJ's conclusion that Plaintiff's pain and limitations significantly resolved post-surgically such that she could perform the stated RFC is not supported by the substantial evidence of record, even by the ALJ's own summary." *Id.* Finally, Plaintiff argues that Defendant "does not provide a meaningful response to Plaintiff's assertion that the ALJ failed to demonstrate consideration of Plaintiff's limitations in performing activities of daily living, which were relevant to the question of whether Plaintiff could sustain activity or had to alternate positions frequently." *Id.* at 7.

The Eleventh Circuit has established a three-part "pain standard" to be utilized by the ALJ when a claimant tries to "establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991). The standard requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.* Further, "[t]he claimant's subjective testimony supported by

medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Id.* The ALJ must specifically explain why he or she is deciding to discredit such testimony, and "[f]ailure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Id.*

Here, the ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p," as well as all of the opinion evidence. [R. 23]. He then followed the two-step process—first, determining "whether there is an underlying determinable physical or mental impairment . . . that could reasonably be expected to produce [Plaintiff's] pain or other symptoms," and then evaluating "the intensity, persistence, and limiting effects" of Plaintiff's pain or other symptoms to determine the extent to which they limit her functions. [R. 23]. In doing so, he concluded that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." [R. 23]. According to the ALJ, this was because Plaintiff "consistently reported that her condition improved following surgery and, while [Plaintiff] continues to have limitations, [Plaintiff's] gait, lower extremity strength, and range of motion have all generally been either within normal limits or slightly limited on examination following surgery." [R. 23].

In concluding that Plaintiff "consistently reported that her condition improved following surgery," the ALJ relied upon the following: (1) Plaintiff's June 4, 2018 follow-up with Dr. Wang, in which she described being "much better than preop" and reported that "her left lower extremity

strength ha[d] improved significantly since her fusion surgery"; (2) Dr. Lichtblau's June 7, 2018 medical evaluation, in which Plaintiff "reported that her pain had decreased from a 10/10 prior to surgery to a 5–6/10 after surgery"; (3) Dr. Regenbaum's November 19, 2018 consultation notes, in which he noted that Plaintiff had reported "some improvement" after her November 2017 surgery; (4) Plaintiff's November 28, 2018 MRI, which demonstrated "little difference from [Plaintiff's] November 2017 imaging"; (5) Plaintiff's December 5, 2018 visit with Dr. Mate, in which Plaintiff noted that surgery had "definitely helped her"; and (6) Plaintiff's follow-up with Dr. Wang on April 29, 2019, in which she noted she had "gotten some gainful improvement" from her November 2017 surgery. [R. 1173; R. 24, 872; R. 1183; R. 25, 1186; R. 1202; R. 1386]. However, the record is crystalline that Plaintiff continued to complain of significant pain issues, even at those same visits upon which the ALJ relies.

Specifically, during Plaintiff's June 4, 2018 follow-up, Plaintiff reported "severe burning and aching in the lower back and down to the left lower extremity with numbness on the dorsum of the left foot." [R. 1173]. At that same visit, Dr. Wang noted Plaintiff was "still very inhibited and disabled by her symptomatology." [R. 1173]. With respect to Plaintiff's June 7, 2018 medical evaluation, although a reduction in pain from a 10/10 to a 5–6/10 is technically an improvement, it hardly indicates that Plaintiff's pain symptoms were resolved. Indeed, during that same evaluation Plaintiff reported good days and bad, stating that she "continue[d] to experience intermittent radiating pain into her left buttock down her lateral and posterior thigh with numbness and tingling in the plantar aspect of her left foot." [R. 873].

Next, as to Plaintiff's November 19, 2018 follow-up with Dr. Regenbaum, Plaintiff's statement that she "had some improvement" was merely in the context of Plaintiff's "history of

present illness"—she did not necessarily report improvement at that specific appointment itself. [R. 1183]. In fact, Dr. Regenbaum's notes indicated that Plaintiff reported pain "especially while driving" and being "scared" to walk. [R. 1183]. With respect to Plaintiff's November 28, 2018 MRI showing "little difference," both before and after Plaintiff's November 2017 surgery (which covered the L4-L5 disc space), Plaintiff had abnormalities at the L1-L2, L2-L3, L3-L4, and L5-S1 disc spaces. [R. 1186]. And, reliance on such MRI ignores: (1) that there were new degenerative changes found at the L2-L3 level between the May 30, 2018 and April 11, 2019 x-rays of Plaintiff's lumbosacral spine; and (2) Dr. Mate's assessment that there was "[l]ikely . . . additional pathology above the surgical level which is responsible for [Plaintiff's] symptoms." [R. 1400, 1205].

Further, as to Dr. Mate's December 5, 2018 evaluation, Plaintiff complained about pain on the left side of her lower back, stated that after 15 minutes of sitting or walking her pain increased, and stated she could not sit for a prolonged period of time without aggravating her pain. [R. 1202]. And lastly, at Plaintiff's April 29, 2019 follow-up visit with Dr. Wang, although Dr. Wang noted Plaintiff had gotten "some gainful improvement," Dr. Wang immediately qualified such statement by noting that Plaintiff "still has significant pain and limitation," stating that Plaintiff could only walk for about 30 minutes. [R. 1386]. Thus, while the Court is again cognizant that it may not reweigh the evidence, it appears that Plaintiff's "consistent" reports of improvement may be somewhat of a misrepresentation of her condition. Moreover, to the extent the ALJ once again relied extensively on Plaintiff's gait, lower extremity strength, and range of motion, the Court has already addressed such matter above.

It is important to note that this was not a situation in which there was a lack of objective medical evidence in connection with Plaintiff's subjective allegations of pain symptoms. While

the ALJ focuses almost exclusively on Plaintiff's condition after her November 2017 surgery (apparently acknowledging Defendant's condition and limitations prior to that point), as just stated, there were abnormalities at the L1-L2, L2-L3, L3-L4, and L5-S1 disc spaces both prior to and after her fusion surgery. [R. 1186]. In addition, even *after* Plaintiff's surgery, there were additional degenerative changes at the L2-L3 disc space as demonstrated by Plaintiff's April 11, 2019 x-ray. [R. 1400]. But perhaps most importantly, in July of 2019, Plaintiff underwent electromyography and nerve conduction studies of her bilateral lower extremities, which demonstrated "left L5/S1 root dysfunction." [R. 1449]. Thus, while the ALJ's analysis of the medical evidence is conducted against the backdrop of a "successful" back surgery, the record appears to indicate otherwise.

Finally, although the ALJ attributes some significance to Plaintiff's ability to perform her daily living activities, R. 26, it is difficult to discern how Plaintiff's ability to prepare a meal, perform personal care, do light housecleaning, or do laundry would indicate "less limiting" impairments, as such activities would seemingly be unaffected by Plaintiff's stated need to frequently change positions and lie down. *See Simon*, 7 F.4th at 1108 (stating that a claimant's ability to conduct certain daily living activities does not "say much about whether a person can function in a work environment—with all of its pressures and obligations—on a sustained basis"). To the extent the ALJ referenced shopping, Plaintiff previously stated she could shop but did not "carry anything heavy" and was limited as "to how long I can shop without resting or lying down on a public bench for a break." [R. 391]. And, to the extent the ALJ referenced driving, Plaintiff testified she could only drive short distances for approximately half an hour and would need to

recline thereafter. [R. 1466]. Indeed, the ALJ did not explain his basis as to why these daily living activities rendered Plaintiff's impairments less limiting. *See* R. 26.

Accordingly, while the Court again declines to specifically determine whether substantial evidence supports the ALJ's assessment of Plaintiff's subjective allegations, on remand, while the ALJ is considering Plaintiff's severe and non-severe mental and physical impairments as part of his RFC determination as to Plaintiff, the ALJ should carefully review the medical record evidence as a whole, taking into account the Court's concerns as identified above. This will be of assistance to the Court in the event that further review is sought in this Court after remand.

## IV. <u>CONCLUSION</u>

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. On remand, the Commissioner should consider both Plaintiff's severe and non-severe mental and physical limitations when determining Plaintiff's RFC, and should reassess the entire record and reconsider and weigh all available medical records and medical opinion evidence, as required by the applicable rules and law.

2. Accordingly, Plaintiff's Amended Motion for Summary Judgment [DE 24] is hereby **GRANTED**, and Defendant's Motion for Summary Judgment [DE 32] is hereby **DENIED**.

3. Pursuant to Federal Rule of Civil Procedure 58, a separate judgment shall be entered in accordance with this Order.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 20th day of September, 2022.

WILLIAM MATTHEWMAN
United States Magistrate Judge